1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLASS STRAUSS,<br><br>          Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | Civil No. 12cv491-DHB<br><br>**MEMORANDUM OF DECISION**<br>**FOLLOWING TRIAL** |

Plaintiff, Douglass Strauss, brings this negligence action against the United States of America based on an alleged accident that occurred aboard the USS McCLUSKY on December 2, 2011.

The parties consented to have this action tried before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).  A bench trial was held on November 12, 13 and 14, 2014.  Preston Easley and Levi Plesset appeared on behalf of Plaintiff, and Vickey L. Quinn appeared on behalf of Defendant.

Having carefully reviewed the evidence and the arguments of the parties as presented at trial, the Court finds for Plaintiff and directs an award of $1,855,149.67 in his favor.  The Court sets forth the following findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1]

## I.     JURISDICTION AND VENUE

The Court has jurisdiction of this action pursuant to the Public Vessels Act, 46 U.S.C. § 31101-31113; the Suits in Admiralty Act, 46 U.S.C. § 30901-30918; and admiralty, 28 U.S.C.§ 1333.  This suit is also brought subject to the provisions of the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 901-950 ("LHWCA").   Venue is proper because the USS McCLUSKY, a public vessel of the United States, was moored at a pier in navigable waters of the United States at Naval Station, San Diego, California, at the time of the alleged accident.  46 U.S.C. § 31104, 30906.

## II.    PLAINTIFF'S MOTION TO STRIKE TESTIMONY OF JONATHAN NISSANOFF, M.D.

On November 13, 2014, Defendant called Jonathan Nissanoff, M.D. as an expert witness.  Prior to trial, Dr. Nissanoff authored two expert reports, one dated March 12, 2013 and another dated June 24, 2014.  These reports were admitted as Defendant's Trial Exhibit A.   In the March 12, 2013 Report, Dr. Nissanoff recommended several treatment options for Plaintiff, including "[i]n the worst case scenario, he may come to a total knee replacement surgery, however we would try to defer this procedure ideally until he is in his sixties."  In the June 24, 2014 Report, Dr. Nissanoff stated that Plaintiff had reached maximum medical improvement, and was unable to return back to his usual and customary duties.  Dr. Nissanoff opined that Plaintiff "may need total knee replacement surgery in the future, however I do not believe this would afford him to return back to his usual and customary duties."

/ / /

---

[1] To the extent that any statement in the findings of fact makes reference to the law, it is to be construed as both a finding of fact and conclusion of law, and to the extent any conclusion of law includes any matter of fact, it shall be deemed to have been found by the Court as both a finding of fact and conclusion of law.

12cv491-DHB

At trial, Dr. Nissanoff testified on direct examination that if Plaintiff had a total knee replacement surgery, he would be able to return to his prior work at NASSCO. Dr. Nissanoff stated there was literature that suggested 98 percent of people who have total knee replacement surgery go back to their usual work.

On cross-examination, Dr. Nissanoff admitted that his opinion had changed since he wrote his reports. Dr. Nissanoff stated that he changed his opinion based on a recent study that he had read. At that point, Plaintiff's counsel moved to strike Dr. Nissanoff's testimony that was inconsistent with his expert reports. The Court denied Plaintiff's motion. Thereafter, Plaintiff proceeded with his cross-examination.

The following day, on November 14, 2014, the Court advised the parties that it was willing to reconsider Plaintiff's motion to strike, and directed the parties to file supplemental post-trial briefing on the issue. On November 21, 2014, the parties filed their post-trial briefs. (ECF Nos. 136, 137.)

Having considered the arguments of counsel at trial and the parties written submissions, the Court reverses its prior ruling and grants Plaintiff's motion to strike Dr. Nissanoff's undisclosed trial testimony.

Plaintiff argues Dr. Nissanoff's opinion that Plaintiff could return to his full duties at NASSCO if he had a total knee replacement surgery was not properly disclosed prior to trial. Plaintiff notes that he was not provided with a copy of the study Dr. Nissanoff relied on. Plaintiff argues that Dr. Nissanoff's testimony was prejudicial, and that had his opinion been fully disclosed in advance, it would have altered Plaintiff's presentation of his case. Plaintiff also argues the testimony violated the Court's scheduling order and Rule 26.

Under Rule 26(a)(2), expert reports must contain "a complete statement of all opinions the witness will express and the basis and reason for them." Fed. R. Civ. P 26(a)(2)(B). Rule 26(e)(2) further provides that:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extend both to information included in the report and to information given during the expert's deposition. *Any*

12cv491-DHB

*additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.*

Fed. R. Civ. P. 26(e)(2) (emphasis added).  If a party fails to properly supplement its expert reports, the party is not allowed to use the undisclosed information at trial, unless the failure to supplement was substantially justified or harmless.  Fed. R. Civ. P 37(c)(1).  *See also In re Kreta Shipping*, S.A., 181 F.R.D. 273, 275 (S.D.N.Y. 1998) ("Expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1).").

In this case, Dr. Nissanoff's opinion that Plaintiff could return to his prior work duties if he had a total knee replacement surgery was not set forth in his expert reports, and was not disclosed before the September 16, 2014 pretrial disclosures deadline. (*See* ECF No. 86.)  The first time Dr. Nissanoff's opinion in this regard was revealed was during his trial testimony.   Therefore, Dr. Nissanoff's undisclosed opinion is excludable, unless Defendant can show the failure to supplement his report was substantially justified or harmless.

Defendant argues Plaintiff's motion to strike Dr. Nissanoff's testimony was improper, that cross-examination was the proper trial tool to challenge Dr. Nissanoff's opinion, and that even if his testimony is considered a change from his reports, the failure to produce was substantially justified and harmless.

First, the Court finds the motion to strike was properly raised, and declines to deny Plaintiff's motion on that basis.   Second, although cross examination is the proper way to challenge an expert's opinions, upon further reflection, the Court determines that this case presents a different issue.   Here, the issue is whether the opinion was properly disclosed to begin with.   If it was not, then the remedy is exclusion, not cross examination.   Third, the Court finds Dr. Nissanoff's testimony did constitute a material change from his reports.   Although Dr. Nissanoff identified total knee replacement as a potential treatment in his reports, his opinion that Plaintiff could return to his prior work at NASSCO if he had a total knee replacement was not

4

disclosed.  Moreover, Dr. Nissanoff testified that his opinion that Plaintiff would be able to return to full duty at NASSCO was based on a study he had recently read. Contrary to Defendant's argument, Dr. Nissanoff did not say that his opinion changed based on new evidence of Plaintiff's medical condition.  Therefore, the Court finds the change in opinion was not based on new information that was presented at trial. Defendant also argues that Plaintiff could have deposed Dr. Nissanoff after he issued his second report, but he chose not to.  The Court finds this is irrelevant.  Deposition testimony does not cure deficiencies in the disclosure requirements of Rule 26.  *See LaMarca v. United States*, 31 F.Supp.2d 110, 123 (E.D.N.Y. 1998).

The Court finds that Defendant has failed to establish that its failure to timely disclose Dr. Nissanoff's opinion was either substantially justified or harmless. Accordingly, the portion of Dr. Nissanoff's testimony relating to Plaintiff's ability to return to full duty at NASSCO if he had a total knee replacement will be stricken.

## III.   TRIAL TESTIMONY

The following summarizes the testimony of the witnesses at trial.

### A.   <u>Douglas Strauss</u>

Plaintiff Douglass Strauss started working at NASSCO in 1990.  He subsequently went to work for other companies, but returned to NASSCO in 2000.  In 2005 or 2006, Plaintiff was promoted to Machinery General Supervisor II.  This was the position Plaintiff held on the date of his accident.  Plaintiff's work at NASSCO involved extensive daily work onboard ships, which required Plaintiff to use stairs, vertical ladders, crawl spaces, and scaffolds.

Plaintiff testified that on the morning of December 2, 2011, he was injured while boarding the USS McCLUSKY, which was pier side in the harbor at the 32nd Street Naval Station.  Plaintiff stated that he was with the Lawrence Stahl at the time the accident occurred.  Plaintiff explained that as he boarded the ship, he stepped down from the brow onto a plastic pallet that was being used as a stair.  When he stepped on the pallet, it bowed, and his foot slipped forward and caught on the lip of

the pallet.  Plaintiff's right knee buckled, and he stumbled onto the deck.  He did not fall all the way down onto to the ship's deck because he was holding the hand rail with his left hand.  Plaintiff stated that he was being careful as he boarded the ship, and did not have anything in his hands.  Plaintiff was wearing rubber soled work boots, and the tread on the soles was in good condition.  Plaintiff looked down at the pallet as he stepped onto it. The pallet did not have non-skid on it, and it was slippery with morning dew.  The sea conditions were calm, and the ship was not moving.

After he slipped, Plaintiff told the Navy Gangway Watch officers that they needed to look at the pallet because someone was going to kill themselves.  Approximately ten minutes later, Plaintiff called the safety department at NASSCO, and spoke with William Benjamin.  He told Mr. Benjamin that there was an unsafe condition with the brow, and that he had jammed his knee.  After Plaintiff got back to his office, he reported the unsafe condition and his injury to his supervisor, Frank Jurado.   Plaintiff testified that prior to his injury he never had any right knee problems.  Immediately after the accident, the pain in his knee was a five, on a scale of one to ten.

Plaintiff continued to work at NASSCO until February 1, 2012.  During that time, he went aboard the USS McCLUSKY and at least one other ship.  Plaintiff tried to compensate for his knee pain by having other employees physically go aboard the ships.  He would also use a golf cart to get to meetings.  In December 2011, NASSCO sent Plaintiff to see Dr. Adsit.  Dr. Adsit recommended that Plaintiff continue to work, so he did.  Several weeks later, Plaintiff was not improving, and told NASSCO's worker's compensation officer, Joshua Roundy, that he needed to get off his knee.  Mr. Roundy scheduled an appointment with Dr. Levine for a second opinion, at Plaintiff's request.

Dr. Levine performed surgery on Plaintiff's right knee in August 2012.  Plaintiff went to physical therapy before and after his surgery.  Plaintiff testified that he tried as hard as he could to improve his knee through the physical therapy.  When

6

Plaintiff was released from Dr. Levine's care, his pain level was between four and five.  At that time, he also avoided using stairs, and did not squat or kneel because it hurt.  Dr. Levine limited Plaintiff to semi-sedentary work, and Plaintiff was not able to perform his duties at NASSCO with that restriction.

Plaintiff next saw Dr. Serocki, who performed a second surgery on Plaintiff's right knee.  After the surgery, Plaintiff went to physical therapy, as prescribed by Dr. Serocki.  Plaintiff was released from Dr. Serocki's care in February 2014.  Dr. Serocki limited Plaintiff to sedentary work, and told Plaintiff he could not go back to his regular job at NASSCO.  Plaintiff stated he has more pain in his knee after being treated by Dr. Serocki than before.  Plaintiff estimated his pain level was between six and seven.  Plaintiff stated his knee also pops, locks, and has a gritty feeling when he bends it.

Plaintiff testified that his pain level currently ranges between five and seven.  He walks with a limp and he has pain in his left wrist and left ankle from using a cane.  Plaintiff has pain medications that he takes as needed.  Plaintiff states that he used to be very active, working all day and performing tasks around his home.  Plaintiff currently avoids stairs, and doesn't climb ladders, squat, kneel, or crawl.  Plaintiff tries to stay as active as possible, does exercises for his knee, and has tried to lose weight.

On December 5, 2012, Plaintiff was terminated from NASSCO.  Plaintiff stated that losing his job was extremely difficult to deal with.  Plaintiff loved his job and found it very satisfying.  He often worked seven days a week.  Plaintiff described losing his job as having his life taken away.  Plaintiff did not immediately quit working after his injury because he felt he had a responsibility to people at NASSCO.  He explained he initially delayed going to the medical clinic because he thought he could shake off the injury.

Plaintiff started vocational rehabilitation training in April 2014, and plans to start a vocational program that will continue through September 2015.

/ / /

12cv491-DHB

### B.    Lawrence Stahl

Lawrence Stahl was called as a witness by Plaintiff.  Mr. Stahl was employed at NASSCO on December 2, 2011 as an outside machinist.  On December 2, 2011, Mr. Stahl boarded the USS McCLUSKY approximately 30 to 40 seconds prior to Plaintiff. Mr. Stahl crossed the gangway and stepped down onto a plastic pallet to get to the deck of the vessel.  The plastic pallet was wet and did not have any "non-skid" on it. Mr. Stahl did not slip, but he saw Plaintiff stumble a little bit when he stepped onto the pallet.  Immediately thereafter, Plaintiff told Mr. Stahl that he did something to his knee, and a week or two later, Plaintiff said he really messed up his knee.  After Plaintiff boarded the vessel, Mr. Stahl saw Plaintiff go over to the Navy Watch and presumably discuss the pallet.

### C.    Francisco Jurado

The second witness called by Plaintiff was Francisco Jurado.  Mr. Jurado was Plaintiff's supervisor at NASSCO.  On December 2, 2011, Plaintiff went to Mr. Jurado's office to report a safety issue with the brow on the USS McCLUSKY. Plaintiff showed Mr. Jurado pictures of the plastic pallet.  Plaintiff also told Mr. Jurado that he twisted his knee.  Mr. Jurado took the pictures from Plaintiff, scanned them and sent them to William Benjamin in the safety division.  Mr. Jurado did not report the injury to Mr. Benjamin.  A couple hours later Mr. Juardo noticed that Plaintiff was walking awkwardly and having trouble with his knee.  Mr. Jurado instructed Plaintiff to seek medical attention.  Mr. Jurado subsequently received a FROI report from the medical department that indicated Plaintiff reported his injury to medical on December 9, 2011.  Plaintiff was placed on light duty and never returned to full duty.

Based on Mr. Jurado's investigation, a medical/safety incident evaluation was prepared.  The report indicated that the brow was not set correctly, and noted that Plaintiff should have paid more attention to the conditions of the brow.

/ / /

8

### D.     William F. Benjamin, Jr.

Defendant called William F. Benjamin, Jr. as a witness.  Mr. Benjamin works at NASSCO as a safety representative.   Mr. Benjamin stated he got a report from Plaintiff that the brow on the USS McCLUSKY was slippery.  Plaintiff did not tell Mr. Benjamin that he had been injured.  Thereafter, Mr. Benjamin contacted Francis Dodderer regarding the condition of the brow.  Mr. Benjamin testified that he was uncertain, but he believed he first learned about Plaintiff's injury two weeks after the date of the incident.

### E.     Francis J. Dodderer

Defendant called Francis J. Dodderer.   Mr. Dodderer is an environmental specialist for the United States Navy who conducts safety and environmental oversight on Navy vessels.  Mr. Dodderer received a call from William Benjamin at NASSCO.  Mr. Benjamin reported that an employee had slipped on a plastic pallet.  Mr. Benjamin did not report an injury.  Mr. Dodderer testified that NASSCO has a duty to provide the Navy with a mishap report if an injury occurs aboard a United States government ship.  As far as Mr. Dodderd knows, NASSCO never submitted a mishap report for Plaintiff's injury.

### F.     William S. Adsit, M.D.

The parties stipulated that the deposition testimony of William S. Adsit, M.D. would be admitted as evidence at trial.  NASSCO referred Plaintiff to Dr. Adsit for treatment.  Dr. Adsit first saw Plaintiff on December 21, 2011.  Plaintiff reported pain underneath his kneecap.  Dr. Adsit examined Plaintiff, and noted that his range of motion in his right knee was limited.  An X-Ray and MRI was taken of Plaintiff's knees.  Dr. Adsit stated the MRI showed Plaintiff had a full thickness fissure of the cartilage under his right kneecap.  The split in the cartilage went all the way down to the underlying bone.  Dr. Adsit noted Plaintiff also had bone edema.  Dr. Adsit recommended Plaintiff decrease his work demands for 6 to 8 weeks, then begin physical therapy.

Plaintiff returned to see Dr. Adsit on January 6, 2012.   Plaintiff reported a crunching sensation in his knee.   Dr. Adsit prescribed the use of a neoprene sleeve, and physical therapy to begin in four weeks.   Plaintiff did not return to see Dr. Adsit for a follow-up appointment on February 3, 2012.   Dr. Adsit felt Plaintiff was a cooperative patient, and was not misleading.

On April 17, 2012, Dr. Adsit conducted a records review for NASSCO, and opined that it was reasonable and necessary for Dr. Levine to conduct arthroscopic surgery.  Dr. Adsit explained that it was possible bits of cartilage may have broken off Plaintiff's patella, and that surgery could improve the condition.  He also stated that he felt Plaintiff could continue work in a sedentary position.

Dr. Adsit testified that he could not say for certain what caused the fissure. However, he opined that it most likely occurred when Plaintiff slipped on the brow. Dr. Adsit stated that it was medically reasonably probable that when Plaintiff's foot slipped and then hit the lip of the pallet, his kneecap continued to go forward with momentum and banged against the thigh bone, causing the fissure in the cartilage under the patella and stressing the bone underneath it.

**G.   Sidney H. Levine, M.D.**

Plaintiff called Sidney H. Levine, M.D.   Dr.   Levine is Plaintiff's treating physician.  Dr. Levine first saw Plaintiff on February 2, 2012.  Plaintiff presented with pain in his right knee, a limp, and limited mobility of the knee.   Dr. Levine found Plaintiff had sustained a full thickness chondral fracture of his patella.  Dr. Levine found the injury was traumatic, and not cumulative.  Dr. Levine believed the injury occurred when Plaintiff tripped.  Dr. Levine surmised that when Plaintiff tried to keep from falling, his quadriceps muscle pulled tight, and his patella jammed against the femur, causing the injury to the underside of the kneecap.

Dr. Levine reviewed an MRI that had been ordered by Dr. Adsit.  Dr. Levine found the MRI was consistent with a traumatic injury.  Dr. Levine initially treated Plaintiff with a lubricant injection in the knee and recommended physical therapy.  Dr.

Levine also prescribed the use of a cane and pain medication. Dr. Levine took Plaintiff off work due to his pain level, cane use, and medications. Dr. Levine did not find Plaintiff's weight was a significant factor impacting his condition.

On August 1, 2012, Dr. Levine performed arthroscopic surgery on Plaintiff. Dr. Levine first requested approval for the surgery from NASSCO in February 2012. Dr. Levine stated that the type of injury Plaintiff had would not get better without surgical treatment. During the procedure, Dr. Levine looked at the knee joint, and observed that the edges of the cartilage under the kneecap were not smooth and rounded, which indicated a traumatic injury had occurred, in contrast to an injury that had been sustained over a long period of time. Dr. Levine cleaned and smoothed the underside of the kneecap.

On March 7, 2013, Dr. Levine found Plaintiff permanent and stationary, and restricted him to semi-sedentary work. Dr. Levine did not believe any further physical therapy could have allowed Plaintiff to return to his full duties at NASSCO. Dr. Levine also referred Plaintiff to Dr. Serocki for a second opinion. Dr. Levine did not believe it was appropriate to perform a full knee replacement on Plaintiff at that time. Dr. Levine did not believe a total knee replacement would allow Plaintiff to return to his full work duties. Dr. Levine testified that he does not perform partial kneecap replacements.

Plaintiff returned to Dr. Levine for treatment on October 30, 2014. Plaintiff reported constant pain and had a significant limp. Dr. Levine found Plaintiff had synovial thickening of his right knee, indicating the lining of his knee is irritated. His range of motion in the right knee is also limited. Dr. Levine also determined Plaintiff has permanent damage to his quadriceps, that will be an ongoing problem. Dr. Levine stated that at some time in the future, Plaintiff will need a total knee replacement. Dr. Levine restricted Plaintiff to sedentary work.

/ / /

/ / /

11

### H.   John Serocki, M.D.

Defendant called John Serocki, M.D.   Dr. Serocki was Plaintiff's treating physician.   Dr. Serocki first saw Plaintiff on May 7, 2013.   Dr. Serocki noted that Plaintiff was somewhat overweight and his quadriceps strength was very poor, which can prevent a patient from a good recovery after surgery.   Dr. Serocki advised Plaintiff that it was important for him to strengthen his quadriceps.   On September 19, 2013, Dr. Serocki performed a partial knee replacement surgery on Plaintiff.   Following the surgery, Plaintiff went to physical therapy.   Dr. Serocki testified that Plaintiff was compliant with physical therapy, and that he was as motivated as any patient Dr. Serocki has treated.

Dr. Serocki found Plaintiff was permanent and stationary on February 11, 2014. At that time, Dr. Serocki stated Plaintiff's right quadriceps was very weak, and there was a one centimeter circumference difference between Plaintiff's right and left leg. However, an electrodiagnostic test showed there was no evidence of nerve or muscle damage. Dr. Serocki found Plaintiff has chronic, irreversible weakness of the quadraceps due to the nature of the injury and the prolonged course of treatment. Dr. Serocki did not find the chronic weakness was due to Plaintiff's fault. Dr. Serocki stated Plaintiff would not be able to return to his prior work.

### I.   Jonathan Nissanoff, M.D.

Defendant called Jonathan Nissanoff, M.D. as an expert witness.   Dr. Nissanoff conducted an independent medical evaluation of Plaintiff on March 12, 2013, which was after Plaintiff's arthroscopic surgery, but before his partial knee replacement surgery.   Dr. Nissanoff noted that Plaintiff walked with a limp, and used his cane in the wrong hand.   Dr. Nissanoff found weakness in Plaintiff's right quadriceps muscle, but found his girth was equal in both legs.   Dr. Nissanoff recommended Plaintiff have a "second look" arthroscopy, and set forth the following five treatment options for Plaintiff: (1) cartidel transplantation; (2) a Fulkerson procedure; (3) a patellectomy; (4) a patellofemoral replacement (or partial knee replacement); or (5) a total knee

replacement.  Dr. Nissanoff stated that the first and second options have good success rates.  Dr. Nissanoff opined that he would not have chosen the fourth option because it only has a 50% success rate.  Dr. Nissanoff also recommended that Plaintiff lose approximately 10% of his body weight.

On April 23, 2013, Dr. Nissanoff reviewed an MRI and x-rays of Plaintiff's hips and knee.  Dr. Nissanoff found that there was no arthritis.

On June 24, 2014, Dr. Nissanoff re-examined Plaintiff.  This examination occurred after Plaintiff's partial knee replacement surgery.  Plaintiff reported that he was in in more pain, and felt worse following the second surgery.  Dr. Nissanoff found the weakness in Plaintiff's right leg had increased, and that there was significant atrophy of Plaintiff's right quadriceps.  Dr. Nissanoff did not believe Plaintiff had nerve damage at that time.  Dr. Nissanoff found Plaintiff would not get any better without further treatment.  Dr. Nissanoff stated that presently Plaintiff is limited to semi-sedentary work.  Because Plaintiff had the partial knee replacement, his only remaining treatment option is a total knee replacement.  Dr. Nissanoff estimated the cost of a total knee replacement to be $50,000.00.  The recovery period for a total knee replacement is three months to one year.

### J.  Larry D. Dodge, M.D.

Defendant called Larry D. Dodge, M.D.  Dr. Dodge is an orthopedic surgeon who was hired by NASSCO to conduct a qualified medical examination of Plaintiff.  Dr. Dodge examined Plaintiff on May 1, 2012.  Dr. Dodge stated Plaintiff sustained a right knee strain.  Dr. Dodge also stated Plaintiff had early arthritis under his kneecap, which he could have aggravated.  Dr. Dodge found Plaintiff could work, as long as he avoided squatting, kneeling, repetitive stair climbing or hard climbing.  Dr. Dodge did not think Plaintiff needed a cane.  Dr. Dodge agreed it was reasonable for Plaintiff to undergo arthroscopic surgery.

/ / /

/ / /

12cv491-DHB

### K.   Richard Anderson

Plaintiff called Richard Anderson as an expert witness.  Mr. Anderson is a vocational rehabilitation counselor.  Mr. Anderson testified that had Plaintiff not been injured, he would have continued to work as a General Supervisor II for NASSCO until he chose to retire.  Mr. Anderson stated that as a result of the accident, Plaintiff is unable to continue to work as a General Supervisor II.  Mr. Anderson concluded Plaintiff will be limited to sedentary work, based on the medical reports by Dr. Levine and Dr. Serocki.  Mr. Anderson also found Plaintiff will be limited to part time work.  This conclusion was based on the results of vocational testing he conducted on Plaintiff.

Mr. Anderson found Plaintiff is currently unemployable because of his pain limitations, use of a cane, age, and level of education.  However, Mr. Anderson testified that Plaintiff wants to return to work, and will likely be able to if certain conditions are met.  Mr. Anderson stated Plaintiff will need vocational rehabilitation in order to find sedentary work.  Mr. Anderson estimated the cost of the vocational training would be $8,000.00 - $10,000.00.  Mr. Anderson opined that after receiving vocational training, the types of jobs available to Plaintiff include tool crib attendant, personnel scheduler, maintenance dispatcher, and electrical parts salesperson.  These positions typically earn $25,000 - $37,000 per year for full time work (increasing to $29,000.00 - $45,000.00 per year, with five years of experience).  Mr. Anderson estimated that Plaintiff would be able to return to work in February 2016.  Mr. Anderson opined that Plaintiff will likely work until he is at least 65 years old, but on a part-time basis.

### L.   Tamorah Hunt

Plaintiff called Tamorah Hunt as an expert witness.  Ms. Hunt is a forensic economist.  Ms. Hunt calculated Plaintiff's past economic losses and future economic losses.  To determine Plaintiff's loss, Ms. Hunt used pre-injury actual pay rates.  She also included the value of the employer contribution to the savings plan and the value

of the pension plan in her analysis.  To determine the future loss, Ms. Hunt calculated the difference between Plaintiff's projected earnings as a General Supervisor II at NASSCO, less his offset earnings.  Ms. Hunt relied on Mr. Anderson's report for the basis of the offset earnings calculations. Ms. Hunt calculated the offset earnings based on the assumption that Plaintiff will return to work in February 2016, on a part-time basis, and will earn $15,769.00 per year, increasing to $18,649.00 per year, over a five-year period.  Ms. Hunt also reduced the earnings for income taxes and business expenses.

Ms. Hunt found that from the date of the injury through November 30, 2014, Plaintiff's past loss was $270,949.00.  Ms. Hunt determined that the Plaintiff's future loss would be $1,911,993.00.  Then, based on Mr. Anderson's report, she determined that Plaintiff's offset earnings would be $276,902.00.  Therefore, Ms. Hunt concluded that the present value of Plaintiff's future loss is $1,635,091.00.  Ms. Hunt stated that Plaintiff's total past and future economic loss is $1,960,040.00.

On cross examination, Ms. Hunt testified that if Plaintiff were to return to work on a full-time basis, his offset earnings would be $538, 804.00, and the present value of his future loss would be $1,373.189.00.  The total economic loss would then be $1,644,138.00.

### M.    Roger A. Thrush, Phd.

Defendant called Roger A. Thrush as an expert witness.  Dr. Thrush is a vocational counselor.  Dr. Thrush opined that Plaintiff is employable in the San Diego labor market based on Plaintiff's work history, education, transferrable skills, medical records, and Dr. Nissanoff's report.  Dr. Thrush's opinion was based on the following assumption: (1) Plaintiff had been medically released to return to full-time sedentary or semi-sedentary work, (2) Plaintiff could have begun vocational rehabilitation on March 1, 2014, and (3) Plaintiff is motivated to seek and return to work.  Dr. Thrush determined Plaintiff would benefit from 50 hours of vocational counseling to assist him in finding a new job, and estimated Plaintiff could return to work within six to

twelve months.  Dr. Thrush stated the cost of the vocational services would be $150 per hour.  Dr. Thrush did not find Plaintiff would need vocational rehabilitation or training.  Dr. Thrush also did not believe Plaintiff's age would be an obstacle in finding employment.

Dr. Thrush opined that Plaintiff could be qualified for the following occupations: Warehouse Supervisor, Production Supervisor, Procurement Clerk, Production/Plan/Expedite Clerk, or Tool Crib Supervisor.  Dr. Thrush stated that Plaintiff's earning capacity for these jobs ranges from $41,72.005 per year, to $57,429.00 per year.

Dr. Thrush stated that Plaintiff's vocational expert, Mr. Andersen, had no medical foundation for his opinion that Plaintiff can only work part-time.  Dr. Thrush opined that Plaintiff could return to work full-time.  Mr. Thrush also disagreed with the occupations Mr. Anderson identified for Plaintiff.  He noted that three of the four occupations did not meet the criteria that that they be sedentary or semi-sedentary and use Plaintiff's previous work experience.

## N. Robert R. Trout, Phd.

Defendant called Robert R. Trout as an expert witness. Dr. Trout is a consulting economist.  Dr. Trout calculated Plaintiff's economic loss as a result of his injury.  Dr. Trout set forth five alternate scenarios based on the different treatment opinions of the medical doctors, and Dr. Thrush's opinion regarding what types of jobs are available to Plaintiff.

Under the first scenario, Dr. Trout found Plaintiff's total past and future economic damages, after taxes and business expenses were taken out, would be $14,714.00.  The first scenario was based on Dr. Adsit's records showing Plaintiff had a knee strain, no surgery was required, and that Plaintiff could return to his prior work at NASSCO by April 1, 2012.  In the second scenario, Plaintiff's total losses would be $949,976.00.  The second scenario was based on Dr. Levine's report after he had performed the arthroscopic surgery.  Plaintiff was limited to semi-sedentary work,

with an expected return to work date of October 1, 2013.  In the third scenario, Plaintiff's total losses would be $212,128.00.  The third scenario was based on Dr. Nissanoff's first report, which was issued prior to Plaintiff's second surgery.  Under the third scenario, Plaintiff had no work restrictions, and could have returned to his prior work at NASSCO by July 1, 2014.  In the fourth and fifth scenarios, Plaintiff's total losses were $991,524.00.  The fourth scenario was based on Dr. Serocki's report, and the restriction that Plaintiff could only perform sedentary work. The fifth scenario was based on Dr. Nissanoff's second report, and limited Plaintiff to semi-sedentary work.  Under both scenarios, Plaintiff had an expected return to work date of October 1, 2014.  The total economic damages figure for each of the scenarios set forth by Dr. Trout included the cost of vocational rehabilitation.  Dr. Trout also opined that Plaintiff's estimated retirement benefit loss was $149,308.00.

## IV.   FINDINGS OF FACT

### A.   Stipulated Facts

The following facts were admitted by the parties and are adopted by the Court as findings of fact:

1.     The date of Plaintiff's alleged accident aboard the USS McCLUSKY was December 2, 2011.

2.     At all times relevant, the ship was a public vessel of the United States.

3.     On the date of Plaintiff's alleged accident boarding the ship, he was employed by National Steel and Shipbuilding Company ("NASSCO") as a machinery general supervisor.

4.      At the time of his alleged accident, the vessel was manned by active duty service members of the United States Navy, which maintained a gangway watch on the vessel.

12cv491-DHB

5.   At the time of his alleged accident boarding the ship, a black plastic appearing pallet board was positioned under the vessel end of the gangway or brow.

6.   The entire boarding device was under the control of Defendant.

7.   An injury-producing accident involving a different ship repairworker boarding a different Navy vessel at the Pearl Harbor Naval shipyard in Honolulu had occurred several years before Plaintiff alleged he was injured boarding the USS McCLUSKY in San Diego.  That prior accident involved the use of a wooden material handling pallet which either broke in the incident or was already broken, whereas the subject pallet in this case was described as being made of plastic and was not broken. In the earlier case, a post-accident safety alert was issued by the Navy's safety office at its Hawaii shipyard facility regarding the disfavored placement of wooden pallets per se under boarding devices on its ships at that particular facility without adding a smooth surface.  There was no mention of the use of plastic pallets in the alert, which stated in part that "Material [handling] pallets were not intended for use as walking/working platforms or steps/stairs.  The uneven surface of the pallets created by the open sections between the wood planks creates a tripping hazard. When used in this manner they are often damaged, creating an additional hazard to personnel stepping on them."

8.   A pallet, described as plastic, was in place under the boarding device on the USS McCLUSKY on the day of Plaintiff's alleged accident.

18

12cv491-DHB

9.      The use of the plastic appearing pallet, and the manner of its placement, did not provide a safe step for the use of civilian repair workers employed by private contractors in accessing the ship because it did not provide a solid, uniform and non-slip surface.

10.     Because of the unsafe condition of the particular boarding device on the ship on the day Plaintiff alleges he was injured, including the use of the exact pallet which was used that day and its position under the vessel end of the gangway/brow, the United States as owner of the ship failed to provide a safe means of access to the vessel for an experienced ship repair worker such as this Plaintiff.

11.     The NASSCO fellow employee, who was boarding before Plaintiff, had observed moisture on the pallet, yet had no problem boarding.

12.     Plaintiff did not seek immediate medical attention for his alleged injury.

13.     Plaintiff continued working the remainder of the day after his alleged injury took place, and over the following weekend on overtime.

14.     He first went to the medical clinic at NASSCO seven days after all alleged incident occurred.

15.     Dr. Adsit found Plaintiff fit to continue working on December 22, 2011, three weeks after the alleged incident.

16.     Plaintiff was first found temporarily disabled by Dr. Levine and stopped working, on February 2, 2012, two months after the alleged accident occurred.

12cv491-DHB

17.    In May 2012, Dr. Larry Dodge found that plaintiff was not temporarily disabled.

18.    Plaintiff is now 44 years old.

19.    He has not worked at any job since February 2, 2012.

20.    Plaintiff underwent right knee arthroscopic surgery on August 1, 2012, by Dr. Sidney Levine and partial knee replacement surgery on September 19, 2013, by Dr. John Serocki.

**B.    Evidence from Trial**

Based upon a preponderance of the admissible evidence introduced at trial, the Court makes the following additional findings:

1.    Plaintiff was injured while boarding the USS McCLUSKY on December 2, 2011, when his foot slipped on a plastic pallet.

2.    Plaintiff sustained a full thickness chondral fracture of his right patella when he slipped on the plastic pallet.  Plaintiff's injury was a traumatic injury, and was not a preexisting injury or a cumulative injury.

3.    Plaintiff did not exacerbate his injury by continuing to work following the incident.  Plaintiff reasonably believed the injury might resolve on its own.

4.    Plaintiff sought medical care within a reasonable amount of time following the incident, and Plaintiff complied with the orders and recommendations of his treating physicians.   Plaintiff made an earnest effort to rehabilitate himself.

5.    The condition of the boarding device and the plastic pallet caused Plaintiff's injury and damages.

6.    Plaintiff was injured as a result of Defendant's negligence in failing to provide a safe means of access to the vessel.

7.    Plaintiff was using reasonable care when boarding the vessel.  Plaintiff

12cv491-DHB

did not cause and was not contributorily at fault for the incident or his injuries.

8. Plaintiff has reasonably mitigated his damages by seeking, obtaining and following appropriate medical care, treatment and advice, and by pursuing vocational training to obtain substitute re-employment.

9. Plaintiff will not be able to return to his usual and customary occupation as a machinery general supervisor at NASSCO.

10. Plaintiff is capable of returning to work full time, in semi-sedentary position in the future. Plaintiff will need vocational rehabilitation in order to obtain employment.

11. Plaintiff will require a total knee replacement surgery in the future. The need for the full-knee replacement surgery was caused by Defendant's negligence.

12. As a result of Defendant's negligence, Plaintiff sustained damages including past and future wage loss, past and future medical expenses, and past and future pain and suffering.

## V.   CONCLUSIONS OF LAW

1. Defendant breached its duty to safely maintain areas and equipment under its control and to turn the vessel over to the repairmen, including Plaintiff, in a safe condition, and to provide a safe means of access to the vessel.

2. As a result of Defendant's negligence, Plaintiff was injured. The condition of the boarding device was the proximate cause of plaintiff's injury and damages.

3. Plaintiff was not at fault, and was not contributorily negligent for the accident.

4. Plaintiff has properly mitigated his damages.

5. Plaintiff's damages are assessed at $34,323.52 for past medical expenses.

6. The reasonable value of future medical expenses is $50,000.00.

7. Plaintiff's damages for past wage loss, after taxes are $270,949.00.

8. Plaintiff's damages for future wage loss, loss of fringe benefits, present

21

cash value, after taxes, and vocational rehabilitation are $959,877.15.

9.    Plaintiff's damages for past non-economic pain and suffering are $200,000.00.

10.    Plaintiff's damages for future non-economic pain and suffering are $340,000.00.

11.    Plaintiff is entitled to a judgment against Defendant United States of America in the total amount of $1,855,149.67, plus costs and statutory interest from the date of the judgment.  46 U.S.C. §§ 30911, 31107.

## VI.    CONCLUSION

Based on the foregoing, the Court finds in favor of Plaintiff Douglas Strauss and against the Defendant United States of America, and awards Plaintiff damages in the amount of $1,855,149.67. [2]  The Clerk of the Court is directed to enter judgment according to this order.

**IT IS SO ORDERED**.

Dated: March 2, 2015

DAVID H. BARTICK
United States Magistrate Judge

---

[2] The parties stipulated that the amount NASSCO has paid for medical expenses is $34,323.52.  NASSCO has also paid $184,658.51 in disability indemnity and $31,852.76 in other expenses.  (ECF No. 127.)  Therefore, NASSCO is entitled to recover its full lien of $250,834.79.  *Darwin v. United States*, 435 F.Supp. 501 (N.D. Cal. 1977).